# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>KAINOS PARTNERS HOLDING COMPANY LLC, et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 09-12292 (BLS)<br>(Jointly Administered)<br><br>**Requested Bid Procedures Hearing Date: March 1, 2010 at 1:30 p.m.**<br>**Request Bid Procedures Objection Date: March 1, 2010 at 1:30 p.m.**<br>**Requested Assumption/Assignment Objection Deadline: March 26, 2010 at 12:00 p.m.**<br>**Requested Sale Hearing: March 31, 2010 at a time TBA**<br>**Requested Sale Objection Deadline: March 26, 2010 at 12:00 p.m.** |

## DEBTORS' MOTION FOR AN ORDER (I) APPROVING BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THEIR ASSETS, (II) APPROVING THE FORM AND MANNER OF NOTICE OF THE SALE AND ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND LEASES, (III) APPROVING THE FORM OF ASSET PURCHASE AGREEMENT, (IV) APPROVING AND AUTHORIZING SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS TO THE HIGHEST AND BEST BIDDER(S) FREE AND CLEAR OF ALL LIENS, INTERESTS, CLAIMS AND ENCUMBRANCES PURSUANT TO SECTIONS 105, 363, AND 365 OF THE BANKRUPTCY CODE, (V) WAIVING THE REQUIREMENTS OF

---

[1] The Debtors in these cases, along with the last four digits of their respective federal tax identification numbers, are as follows: Kainos Partners Holding Company LLC (2522), Kainos Partners Buffalo RE Holdings LLC (4572), Kainos Partners Greenville SC-RE Holdings LLC (1049), Kainos Partners Las Vegas RE Holdings LLC (4953), Kainos Vineyard Drive RE LLC (4572), Kainos Highway 29 RE LLC (4368), Kainos 1996 East Main RE LLC (4323), Kainos Wade Hampton RE LLC (0258), Kainos Clinton CML RE LLC (3046), Kainos Wilson Road RE LLC (4582), Kainos Partners Columbia SC LLC (0839), Kainos Partners Houston LLC (2322), Kainos Partners Las Vegas LLC (2311), Kainos Partners Las Vegas LLC Operating Series #1 (2311), Kainos Partners Las Vegas LLC Operating Series #2 (2311), Kainos Partners Las Vegas LLC Operating Series #3 (2311), Kainos Partners Las Vegas LLC Operating Series #4 (2311), Kainos Partners Las Vegas LLC Operating Series #5 (2311), Kainos Partners Las Vegas LLC Operating Series #6 (2311), Kainos Partners Las Vegas LLC Operating Series #8 (2311), Kainos Partners Las Vegas LLC Operating Series #10 (2311), Kainos Partners Las Vegas LLC Operating Series #11 (2311), Kainos Partners Las Vegas LLC Operating Series #13 (2311), Kainos Partners Las Vegas LLC Operating Series #14 (2311), Kainos Partners Las Vegas LLC Operating Series #15 (2311), Kainos Partners Las Vegas LLC Operating Series #18 (2311), Kainos Partners Las Vegas LLC Operating Series #20 (2311), Kainos Partners Las Vegas LLC Operating Series #21 (2311), Kainos Partners Las Vegas LLC Operating Series #24 (2311), Kainos Partners Las Vegas LLC Operating Series #25 (2311), Kainos Partners Las Vegas LLC Operating Series #28 (2311), Kainos Partners Las Vegas LLC Operating Series #34 (2311), Kainos Partners LLC (4132), Kainos Partners South Carolina LLC (2847), Kainos Walden-Transit LLC (8183), Kainos Camp-Southwestern LLC (1665), Kainos Main Street Jimtown LLC (2390), Kainos Fairmount LLC (3145), Kainos Crosspoints LLC (5065), Kainos Main-Bailey LLC (2673), Kainos Boulevard Mall LLC (5711), Kainos Union Rd LLC (5397), Kainos Flix-Transit LLC (6538), Kainos Walden LLC (6538), Kainos NF Maple Road LLC (8345), Kainos Union Road Cheektowaga LLC (9508), Kainos Broadway Retail LLC (5605), Kainos Main-Chippewa LLC (3003), Kainos Transit-Genesee LLC (5497), Kainos Broadway CML LLC (5544), Kainos Eggert Road LLC (0880), Kainos Delaware-Hertel LLC (6137), Kainos Vineyard Drive LLC (5721), Kainos Boston State Road LLC (0995), Kainos Walmart LLC (4344), Kainos Tiger Boulevard LLC (8580), Kainos East Main Street LLC (7907), Kainos East Greer Street LLC (4666), Kainos Fairview Road LLC (4557), Kainos Main & Coffee LLC (4231), Kainos Highway 29 LLC (4679), Kainos 1996 East Main LLC (4618), Kainos East Greenville Street LLC (0171), Kainos Boiling Springs LLC (1260), Kainos West Butler LLC (0160), Kainos Main Street Simpsonville LLC (4281), Kainos North Main Street LLC (0885), Kainos 1131 West Wade Hampton Blvd LLC (6055), Kainos 2903 N. Pleasantburg Dr. LLC l6132), Kainos 520 N. US Highway 25 LLC (6429), Kainos 7252 Moorefield Memorial Hwy. LLC (6376), Kainos Woodruff Road LLC (1085), Kainos 411 The Parkway LLC (6203), Kainos 1551 Laurens Rd. LLC (6330), Kainos 6055 White Horse Rd. LLC (6479), Kainos Calhoun Memorial LLC (6264), Kainos South Pine LLC (0164), Kainos Wade Hampton LLC (0993), Kainos WM Central LLC (1210), Kainos Farrow Road LLC (5453), Kainos Main Street Columbia LLC (5500), Kainos 378 & Sunset LLC (1138), Kainos South Lake Drive LLC (4435), Kainos Clemson Road LLC (0253), Kainos Wilson Road ITC (4465), Kainos Ann & Simmons LLC (4868), Kainos Boulder & Racetrack LLC (5070), Kainos Craig & Jones LLC (5145), Kainos Silverado & Bermuda LLC (4948), Kainos Clinton CML (5727), Kainos Lake Mead & Simmons LLC (2311). The mailing address for Kainos is 26 Parkway Commons Drive, Greer, SC 29650.

**FEDERAL RULES OF BANKRUPTCY PROCEDURE 6004(g) AND 6006(d), (VI) SETTING AUCTION AND HEARING DATES; AND (VII) GRANTING RELATED RELIEF**

Kainos Partners Holding Company LLC ("Kainos" and together with its affiliated Debtors, the "Debtors"), by and through their undersigned counsel, hereby move this Court for entry of an order (the "Motion") pursuant to 11 U.S.C. 101 et. seq. (the "Bankruptcy Code"), including Sections 105, 363, 365 and 503 of the Bankruptcy Code, and Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), and Local Rule 6004-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules") (i) approving bidding procedures (the "Bid Procedures") for the sale of substantially all of their assets (the "Sale"), (ii) approving the form and manner of notice of the sale and assumption and assignment of executory contracts and leases, (iii) approving the form of asset purchase agreement, (iv) approving and authorizing the sale of substantially all of the Debtors' assets to the highest and best bidder(s) free and clear of all liens, interests, claims and encumbrances pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, (v) waiving the requirements of Bankruptcy Rules 6004(g) and 6006(d), (vi) setting auction and hearing dates; and (vii) granting related relief. In support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue of these proceedings and the Motion in this Court is proper under 28 U.S.C. §§ 1408 and 1409.

US_ACTIVE-103243292.5-JARAHL

3. The statutory predicates for the relief requested herein are Sections 105, 363, 365 and 503 of the Bankruptcy Code.

## FACTUAL BACKGROUND

4. On July 6, 2009 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner and the Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. On July 17, 2009, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee").

### A. The Debtors' Businesses

5. Kainos Partners LLC, the predecessor to Kainos, was formed in May 2006 to create a long term alliance with Dunkin' Brands, Inc. ("Dunkin"), and the Debtors are one of the largest 'large area' developers of Dunkin' Donuts restaurants. As of the Petition Date, the Debtors owned and operated fifty-six (56) Dunkin' Donuts franchise stores in the states of New York, South Carolina and Nevada. In addition, eight new stores were under construction. The Debtors currently own and operate forty-one (41) stores.

### B. Capitalization

6. As of the Petition Date, a number of investors had provided a total of approximately $31 million of equity investment capital to the Debtors. Of this amount, PCEP II KPHC Holdings, Inc. ("PCEP") provided approximately $14 million.

7. The Debtors' funded debt capitalization as of the Petition Date was approximately $30 million, oft which $24.9 million was owed to The CIT Group/Equipment Financing, Inc.

3

US_ACTIVE-103243292.5-JARAHL

("CIT"), $4.2 million to Dunkin', and $530,000 to PCEP. In addition, on June 4, 2009, CIT and PCEP jointly made an additional $660,000 loan to the Debtors.

### C. The Debtors' Restructuring Efforts

8.      Prior to the Petition Date, the Debtors entered into a Restructuring Support Agreement (the "RSA") with CIT, PCEP, Dunkin and certain of their respective affiliates. The RSA provided for the terms of the restructuring of the Debtors' balance sheet and operations and the underwriting for the financing of the Debtors' exit from bankruptcy. However, the RSA did not address the terms and conditions of the Debtors' relationship as a franchisee of Dunkin as well as certain other matters.

9.      From the Petition Date through early February, the Debtors pursued and implemented their operational restructuring efforts and continued their negotiations with the other parties to the RSA with respect to the issues which that agreement had left unresolved. During this period, the Debtors closed fifteen (15) stores, consolidated their three (3) regional offices into one and greatly reduced their operating and overhead expenses.[2]  The Debtors also were able to obtain rent reductions and other favorable lease concessions from various landlords that have benefitted their estates and they now have pending before this court their motion to assume their remaining unexpired leases of Non-Residential Property.[3]

10.      Unfortunately, however, the Debtors were unable to reach agreement on their remaining unresolved issues with the other parties to the RSA. By early February, it had become

---

[2] The Debtors filed their Debtors' First, Second, Third and Fourth Omnibus Motions To Reject Unexpired Non-Residential Real Property Leases Pursuant to 11 U.S.C. § 365(a), respectively [D.I. 45, 140, 323, and 326] (collectively, the "Rejection Motions") respectively on On July 17, 2009, September 2, 2009, October 30, 2009 and November 6, 2009.. Orders granting the Rejection Motions were entered on August 18, 2009, September 15, 2009, December 10, 2009, and December 8, 2009, respectively [D.I. 121, 163, 381, and 371] (the "Rejection Orders").

[3] On January 29, 2010, the Debtors filed the Debtors' Motion Pursuant to 11 U.S.C. § 365 for an Order Authorizing the Assumption of Unexpired Leases of Nonresidential Real Property [D.I. 431] (the "Motion to Assume").

US_ACTIVE-103243292.5-JARAHL

apparent that the Debtors soon would require an extension of and an increase in amount of their Debtor-in-Posession loan facility ("DIP Loan"), but that such an extension and increase would not be forthcoming without an agreement on the other unresolved issues between the parties.

11.     On February 12, 2010, the Debtors and other interested parties determined that completion of the Debtors restructuring effort on a continuing stand-alone basis for the Debtors' enterprise was no longer a viable option and that, given the Debtors' ongoing weekly cash operating losses and lack of access to any further borrowing capacity, a sale of the Debtors' assets would have to be pursued on an expedited basis.  There ensued two weeks of very intense discussions to resolve the Debtors' liquidity issues and reach a resolution that would maximize the value of the Debtors' businesses.  Finally, on February 22, 2010, the Debtors, the other parties to the RSA and the Official Committee of Unsecured Creditors reached a consensual agreement on the terms and conditions for a sale of the Debtors' assets for which approval is sought by this Motion.

### D.     Terms of the Sale of the Debtors Assets

12.     On February 24, 2010, with the consent of CIT, PCEP, and the Committee, Dunkin' and the Debtors executed the term sheet (the "Term Sheet") expressing Dunkin's intent to acquire a substantial portion of the Debtors' assets and business operations.  A true and correct copy of the Term Sheet is attached hereto as Exhibit A.  The Term Sheet represents the culmination of the discussions between the Debtors and Dunkin' over the terms under which Dunkin' would commit to be a stalking horse bidder and purchaser for substantially all of the assets of the Debtors in a manner that maximize the proceeds available to creditors and permit most of the Debtors' remaining stores to continue in operation and thereby preserve

5

approximately 550 jobs. This agreement also will enable the Debtors to avoid a default on their existing DIP Loan.

13.    The Debtors and Dunkin' are continuing to negotiate the terms of a sale agreement to a conclusion that will be consistent with the Term Sheet, and the Debtors intend to file with the Court, and serve notice of such filing on all parties who have received notice of this Motion, an executed copy of such sale agreement with Dunkin' (the "Dunkin' Purchase Agreement") as soon as reasonably possible. A condition of the Term Sheet is that the Debtors must use commercially reasonable efforts to file this Motion so that the requested relief is granted by Monday, March 1, 2010.

14.    The Debtors and their professionals believe that entry into the Dunkin' Purchase Agreement for the sale of substantially all of the Debtors' assets, or such other agreement that the Debtors enter into with the prevailing bidder at Auction (the "Successful Bidder"), if that result can be effectuated, currently presents the best possible outcome for these cases. The proposed sale helps ensure that the Debtors will be able to monetize their value as a going concern. As a result, a sale on the time frame proposed in the Bid Procedures not only helps ensure that the value of the estates is maximized, but the Debtors anticipate that the sale may result in the preservation of approximately 550 jobs. The preservation of jobs, when possible, is an important element of any successful Chapter 11 case. See In re Chateauguay Corp., 201 B.R. 48, 72 (Bankr. S.D.N.Y. 1996) (noting that "[p]ublic policy, as evidenced by chapter 11 of the Bankruptcy Code, strongly favors the reorganization and rehabilitation of troubled companies and the concomitant preservation of jobs and going concern values.")

**The Bid Procedures**

6

15.     The Debtors have developed the Bid Procedures so that the sale of the Purchased Assets (as that term is defined in the Term Sheet) occurs in an orderly and efficient manner and to ensure that they receive the highest or best price for the Purchased Assets for the benefit of their creditors and estates.  The Debtors currently intend to submit the Purchased Assets to a market test through the Bid Procedures and the Auction.  The following is a summary of the Debtors' proposed Bid Procedures.[4]  The proposed Order Approving Bidding Procedures in Connection with Proposed Sale of Stores and Related Assets is attached hereto as <u>Exhibit B</u>.

16.     To participate in the bidding process each person (a "<u>Potential Bidder</u>") will be required to deliver (unless previously delivered) the following materials, among other things:

   a.     an executed confidentiality agreement; and

   b.     evidence that the person submitting such bid is "financially qualified" as determined by the Debtors; (ii) the bid may not be contingent upon financing or the completion of any due diligence; and (iii) must be scheduled to close on the Closing Date (as defined below).

17.     Any person who wishes to participate in the bidding process must be a Qualified Bidder.  Neither the Debtors nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Purchased Assets to any person who is not a Qualified Bidder.  Neither the Debtors nor any of their affiliates (or any of their respective representatives) are obligated to furnish any information relating to the Purchased Assets to any person except to Dunkin and other Qualified Bidders.

---

[4]     The summary of the Bid Procedures describes each provision of the Bid Procedures that Local Rule 6004-1 requires a debtor to highlight in a sale motion.

US_ACTIVE-103243292.5-JARAHL

18.     The Debtors shall consider proposals to purchase the Purchased Assets from

Qualified Bidders only in accordance with the terms below (if a proposal meets such terms it

shall be deemed a "Competing Agreement"):

a.      a Competing Agreement shall be for the purchase of substantially all of
        the Purchased Assets and the assumption of substantially all of the
        Assumed Leases and shall contain substantially all of the material terms
        and conditions contained in the Agreement (provided, however, that any
        variations from one or more material terms must, in the aggregate,
        constitute an improvement upon such term or terms as set forth in the
        Agreement) and must be marked to show changes from the Agreement, [5]

b.      The Competing Agreement shall be in writing and be served on counsel to
        the Debtors, Reed Smith LLP, 1201 Market Street Suite 1500,
        Wilmington, DE 19801, Attn: Kathleen A. Murphy; and (ii) counsel to
        Buyer, Ropes & Gray LLP, One International Place, Boston, MA 02110-
        2624, Attn: Don S. De Amicis, so as to be received on or before 12:00
        noon (Prevailing Eastern Time) on March 26, 2010 (the "Bid Deadline");

c.      The Competing Agreement must contain substantially all of the material
        terms and conditions of Dunkin's Purchase Agreement;

d.      The Competing Agreement shall provide for a closing on or prior to April
        1, 2010;

---

[5] A Competing Agreement may be, in the case of a franchisee of Buyer that is in good standing and currently
approved by Buyer for expansion (a "Qualified Franchisee"), for less than all or substantially all of the Purchased
Assets and instead may be for the purchase of one or more stores located in each of the South Carolina, Buffalo,
New York, and Las Vegas, Nevada markets (each a "Territory"), at a purchase price equal to or greater than a price
that Buyer will specify to the Debtors for each individual store located within a Territory, in aggregate amount not to
exceed $5,000,000; provided further, that a Qualified Franchisee may purchase a store development agreement for
or within a Territory if, and only if, the Qualified Franchisee is the successful bidder for such Territory; provided
further, that to the extent a Qualified Franchisee is a successful bidder, Dunkin' or its affiliates will enter into a new
franchise agreement with such Qualified Franchisee covering such store or Territory and any existing franchise
agreement with the Debtors for such store or Territory will be deemed rejected as of the Closing; provided further,
that Qualified Franchisees may acquire certain stores only if the Competing Agreement constitutes an offer to
purchase the entire Territory within which the store is located, such list of stores to be available upon request to
counsel to Buyer, Ropes & Gray LLP, One International Place, Boston, MA 02110-2624, Attn: Don S. De Amicis.

US_ACTIVE-103243292.5-JARAHL

e.    The initial purchase price offered by a Competing Agreement must be in U.S. dollars and not less than $3,510,000 (the Purchase price plus $10,000);

f.    The Competing Agreement must be accompanied by: (i) a certified or bank check or wire transfer of an earnest money cash deposit in accordance with the bidding procedures of not less than ten percent (10%) of the amount of the bid (the "Deposit"); (ii) an executed asset purchase agreement in the form of the Dunkin' Purchase Agreement and executed copies of all other transaction documents necessary to effect the proposed transaction (including all schedules) and a copy of the Dunkin' Purchase Agreement marked to show all changes requested by the bidder (including those related to purchase price); (iii) an executed confidentiality agreement; and (iv) written evidence of a commitment for financing or other evidence of the party's ability to consummate the transaction, pay the purchase price in cash at the Closing, and provide adequate assurance of future performance of any executory contracts and unexpired leases to be assumed and assigned by such bidder; and

g.    In the event of a Competing Agreement, Dunkin shall be entitled to submit successive overbids.

19.    Notwithstanding any provision contained in the Bid Procedures, the Dunkin' Purchase Agreement executed by Dunkin' shall constitute a Competing Agreement upon the entry of an order of the Bankruptcy Court approving the Bid Procedures.

20.    A Qualified Bidder that desires to make a Competing Agreement shall submit the Competing Agreement in writing and executed by an individual authorized to bind the Qualified Bidder. Each Competing Agreement must be served by courier, facsimile, email or as otherwise specified by the Debtors so that it is actually received no later than 12:00 p.m. (Eastern Time) on March 26, 2010 (the "Competing Agreement Deadline").

21.    If Competing Agreements (other than the Dunkin' Purchase Agreement) are received by the Competing Agreement Deadline, the Debtors shall conduct an auction (the "Auction") with respect to the sale of the Purchased Assets. The Debtors propose that the

9

Auction take place on March 30, 2010 at the law offices of Reed Smith LLP at 599 Lexington Avenue, New York, New York 10022 or such later time or other place as the Debtors shall notify all Qualified Bidders who have submitted a Competing Agreement. All Qualified Bidders who wish to participate in the Auction shall be present through representatives who are authorized to make Competing Agreements on behalf of the Qualified Bidder. Only Qualified Bidders who have submitted Competing Agreements will be eligible to participate at the Auction. Only the authorized representatives of each of the Qualified Bidders, Dunkin', the Debtors and their professionals, CIT and its professionals, Palisade, and the members of the Committee and their professionals shall be permitted to attend the Auction.

22.     The Auction will be conducted as follows:

   a.     The Debtors and their professionals will direct and preside over the Auction.

   b.     The Debtors shall maintain a transcript of all bids made and announced at the Auction.

   c.     Each bidder participating at the Auction will certify on record at the commencement of the Auction that it has not and will not engage in any collusion with respect to the bidding or the sale.

   d.     The Debtors will continue the Auction until there is only one bid that the Debtors determine in their sole discretion, exercised in good faith and after consultation with CIT and PCEP, is the highest or otherwise best bid for the Purchased Assets.

   e.     Each bid at the Auction subsequent to the opening bid of Buyer pursuant to the Dunkin' Purchase Agreement must comply with the requirements for a Competing Agreement set forth herein and have a purchase price in an amount at least $10,000 greater than the preceding bid.

23.     The Debtors believe that the proposed Bid Procedures provide an appropriate framework for selling the Purchased Assets and will enable the Debtors to review, analyze and compare all Competing Agreements received to determine which Competing Agreement is in the best interests of the Debtors' estates and their creditors.

US_ACTIVE-103243292.5-JARAHL

24. If the Debtors do not receive any Competing Agreements apart from the Dunkin' Purchase Agreement, then the Debtors will not conduct the Auction; the Debtors will promptly report the same to the Bankruptcy Court and seek the approval of the Bankruptcy Court to effect the sale of the Purchased Assets to Dunkin' pursuant to the Dunkin' Purchase Agreement.

**The Dunkin' Purchase Agreement**

25. Local Rule 6004-1(b)(iv) provides, among other things, that a sale motion "must highlight material terms" of the proposed agreement and sale order. The Debtors submit that the description of the material terms of the to-be-finalized Dunkin' Purchase Agreement and proposed sale order (the "Sale Order") set forth herein complies with Local Rule 6004-1(b)(iv). By way of summary, the primary terms of the to-be-finalized Dunkin' Purchase Agreement are as follows:

Purchased Assets: all assets of the Seller (other than the Excluded Assets, as defined below), including:

    a. The Assumed Leases: any and all real estate leases designated by Buyer (the "Assumed Leases," and the location of such real estate, the "Assumed Lease Properties"). Seller will bear cure costs related to the assumption and assignment of the Assumed Leases. Buyer's obligations are expressly conditioned upon the subject to the valid and enforceable assignment of the Assumed Leases to the Buyer.

        The Assumed Leases will <u>not</u> include the following locations:

        i. 1 Walden Galleria Drive, 783-Space K-14, Cheektowaga, New York (Store # 343123);

        ii. 560 East Windmill Lane, Las Vegas, Nevada (Store #345930);

        iii. 9265 South Cimarron Road, Las Vegas, Nevada (Store # 346789);

        iv. 2903 N. Pleasantburg Drive, Greenville, South Carolina (Store # 345196);

11

> v. 159 S. Pine Street, Spartanburg, South Carolina (Store # 345919);
>
> vi. 7252 Moorefield Memorial Hwy., Liberty, South Carolina (Store #345198); and
>
> vii. 4350 South Durango Drive, Las Vegas, NV (Store #346050)

b. Assumed Executory Contracts: those designated by Buyer, which shall include all franchise agreements, store development agreements, and license rights (the "Assumed Executory Contracts"). Assumed Executory Contracts shall include, but not be limited to, all franchise agreements for franchises at the Assumed Lease Properties and the Purchased Properties, but shall not include franchise agreements for stores at the Released Locations. Assumed Executory Contracts shall also include all store development agreements; provided, however, a Qualified Franchisee (as that term is defined in the Term Sheet) may purchase a store development agreement for or within a Territory if, and only if, the Qualified Franchisee is the successful bidder for such Territory. Buyer will bear cure costs related to the assumption and assignment of the Assumed Executory Contracts designated by Buyer.

c. Purchased Real Property: Buyer will purchase the real property, including all buildings, fixtures, and improvements thereon, at the following locations (the "Purchased Real Property," and the location of such real estate, the "Purchased Properties");

> i. 1129 W. Wade Hampton Boulevard, Greer, South Carolina; and
>
> ii. 3929 Vineyard Drive, Dunkirk, New York

d. Purchased Equipment: Buyer will purchase all of Seller's equipment located at the Assumed Lease Properties and the Purchased Properties (the "Purchased Equipment"). Purchased Equipment will not include equipment currently located in storage or at any property other than the Assumed Lease Properties and Purchased Properties

e. Excluded Assets: The Purchased Assets shall not include (i) cash and receivables; (ii) claims, causes of action and recoveries (A) based on avoidance actions under chapter 5 of the Bankruptcy Code, and/or (B) against former officers and directors of the Debtors or otherwise relating to D&O policy recoveries (including specifically any recoveries from Christopher Cortese) ("A" and "B" collectively , the "Estate Actions");

US_ACTIVE-103243292.5-JARAHL

(iii) any real estate leases other than the Assumed Leases designated by Buyer; (iv) any executory contracts other than the Assumed Executory Contracts designated by Buyer; (v) any real property other than the Purchased Real Property; (vi) any equipment other than the Purchased Equipment; and (vii) any interest or the proceeds available from the sale of the leases, assets or equipment of the Debtors located at (x) Store No. 343434 Flix Transit; and (y) Store No. 343875 Transit Genesee.

f.     <u>Assumed Liabilities</u>: The Buyer will not assume, or be responsible for, any liabilities related to the Seller, the former shareholders of the Seller, or affiliated persons or entities, including without limitation taxes, ordinary course liabilities (including trade accounts payable, accrued operating expenses, leases, agreement and contracts), funded indebtedness (including accrued interest thereon and fees, expenses, indemnities and other amounts in respect thereof), litigation or other contingent claims relating to circumstances extant prior to Closing, deferred compensation obligations, post-retirement employee life insurance or healthcare benefit obligations, environmental liabilities and tax liabilities; <u>provided, however,</u> that the Buyer will assume obligations under the Assumed Leases and the Assumed Executory Contracts which first arise from and after the Closing Date. The Buyer will establish its own lines of credit with the relevant utility companies as of the Closing and will assume future property tax obligations associated with the Purchased Assets accruing after the Closing Date. The Buyer will not assume or be responsible for any liabilities pertaining to the Seller's real estate, including, but not limited to, any unpaid utility and property tax obligations that arose or accrued prior to the Closing Date.

26.     Additionally, there are Carve-Out, Mutual Releases, and Other Terms Relating to Unsecured Creditors provided for in the Term Sheet, the details of which are as follows:

<u>Carve-Out</u>: If Dunkin' is the successful bidder for one or more stores and the Official Committee of Unsecured Creditors (the "Committee") supports the Transaction, Dunkin' will at Closing assign to the estate for the benefit of (i) non-lender general unsecured creditors and (ii) unpaid fees and expenses of Committee professionals in excess of $125,000, its right to repayment of $250,000 of the CML Subsidy Loans and CML Subsidy Loan Obligations (as such terms are defined in that certain Amended and Restated DIP Financing, Ratification and Intercreditor Agreement) (the "<u>Carve-Out</u>"); If Dunkin' is the successful bidder for one or more

13

stores, Dunkin' will also: (i) waive its right to repayment of the remaining $238,693 of the CML Subsidy Loans and CML Subsidy Loan Obligations; (ii) waive its right to repayment of obligations under that certain Amended and Restated DIP Financing, Ratification and Intercreditor Agreement, including but not limited to, the Dunkin' Debt (as defined therein); (iii) release the Debtors from any obligations with respect to pre-petition mortgages granted to Dunkin'; and (iv) waive its right to assert any claim against the Purchase Price, the Carve-Out and/or the Excluded Assets.

Mutual Releases:  In consideration of the Carve-Out and other consideration to be provided by Dunkin' pursuant to the Term Sheet, the Debtors, CIT, KIP I, KIP II, and Palisade, on the one hand, and Dunkin' on the other, will provide a mutual release of each other, and all of their respective officers, directors, affiliates, stockholders, employees, agents, and representatives, from all claims, causes of action, rights, and remedies with respect to all matters relating to the Debtors other than and excepting claims, causes of action, rights, and remedies that arise under the UNL Agreement and the Alliance Agreement, as Dunkin' and CIT understand such agreements to be, and the Agreement (the "Mutual Release").

Other Terms Relating to Unsecured Creditors: In further consideration of the Carve-Out and the support of the Committee for the Transaction, the Committee on behalf of the Debtors' estates and the unsecured creditors, shall release CIT, Palisade, KIP I, KIP II, and Dunkin' and their respective officers, directors, affiliates, stockholders, employees, agents and representatives from all claims, causes of action, rights and remedies with respect to all matters relating to the Debtors. The Committee, on behalf of the Debtors' estates and unsecured creditors, shall further release any interest in or right to recovery from the proceeds of the Excluded Assets other than the Estate Actions until such time as the allowed claims of CIT and

14

Palisade have been paid in full. In the event that the allowed claims of CIT and Palisade are paid in full, unsecured creditors shall be entitled to the proceeds of the Excluded Assets in accordance with the Bankruptcy Code. CIT, Palisade and KIP II agree to waive the assertion of their respective unsecured deficiency claims against the Carve-Out. CIT further agrees to limit its assertion of its unsecured deficiency claims against Estate Actions to the same amount as the total remaining unsecured creditor body (i.e. so that the CIT unsecured deficiency claim will receive no more than 50% of any net amount available to creditors from Estate Actions) until such time as the CIT unsecured deficiency claim has been paid in full. In the event that the CIT unsecured deficiency claim is paid in full, unsecured creditors shall be entitled to the proceeds of the Estate Actions in accordance with the Bankruptcy Code.

27.　　Finally, Local Rule 6004.-l(b)(iv)(J) requires that the Debtors indicate how they will retain access to their books and records to administer their estates after the Closing of the Sale. Each of Debtors and Dunkin' generally are required to preserve their records for the assets to be sold for and to make such records available to the other party for such period of time.

### The Proposed Sale Order

28.　　The proposed Sale Order is attached hereto as <u>Exhibit C</u>. Local Rule 6004-1(b) requires disclosures of relevant portions of the Sale Order. In accordance with Local Rule 6004-1(b), these disclosures are as follows:

    i.　　The Buyer is not an "insider" or "affiliate" of the Debtors (as such terms are defined in the Bankruptcy Code).

    ii.　　Effective upon the Closing, all persons and entities are forever prohibited and enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding, against Buyer or its successors and assigns with respect to any claim, interest, or encumbrance (other than the Assumed Liens). Without limiting the generality of the foregoing, Buyer will have no liability for any claim against the Debtors or their directors,

US_ACTIVE-103243292.5-JARAHL

officers, or shareholders, whether such claim is known or unknown, matured or unmatured, liquidated or unliquidated, contingent or non-contingent. Pursuant to sections 105(a) and 363 of the Bankruptcy Code, the Court will issue a permanent injunction against the holders of any claims, interests, and encumbrances (other than the Assumed Liens) against the Debtors with respect to assertion of or taking any action to collect or enforce such claims, interests, and encumbrances against Buyer.

iii.     Except with respect to liabilities expressly assumed in the Asset Purchase Agreement, the Closing and the consummation of the transactions contemplated by the Asset Purchase Agreement shall not subject Buyer to any liability whatsoever with respect to the prepetition operation of the business of the Debtors or the postpetition operation of the business of the Debtors. Buyer is not holding itself out to the public as a continuation of the Debtors, and no common identity of incorporators, directors, or stockholders exists between Buyer and the Debtors. Pursuant to the Asset Purchase Agreement, Buyer is not purchasing all of the Debtors' assets. The transactions contemplated by the Asset Purchase Agreement do not amount to a consolidation, merger, or *de facto* merger of Buyer and the Debtors and/or the Debtors' estates, there is not substantial continuity between Buyer and the Debtors, there is no continuity of enterprise between the Debtors and Buyer, Buyer is not a mere continuation of the Debtors or the Debtors' estates, and Buyer does not constitute a successor to the Debtors or the Debtors' estates. Upon the Closing, Buyer shall be deemed to have assumed only the liabilities expressly assumed in the Asset Purchase Agreement. Except for those assumed liabilities, Buyer's acquisition of the Purchased Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the Closing. Buyer's operation and use of the Purchased Assets acquired from the Debtors shall not be deemed a continuation of the Debtors' business. The Court finds that Buyer would not have acquired the Purchased Assets but for the foregoing protections against potential claims based upon "successor liability" theories.

iv.     Effective upon the Closing, all persons and entities are forever prohibited and enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding, against Buyer or its successors and assigns with respect to any claim, interest, or encumbrance (other than the Assumed Liens). Without limiting the generality of the foregoing, Buyer shall have no liability for any claim against the Debtors or their directors, officers, or shareholders, whether such claim is known or unknown, matured or unmatured, liquidated or unliquidated, contingent or non-contingent. Pursuant to sections 105(a) and 363 of the Bankruptcy Code, the Court hereby issues a permanent injunction against the holders of any

US_ACTIVE-103243292.5-JARAHL

claims, interests, and encumbrances (other than the Assumed Liens) against the Debtors with respect to assertion of or taking any action to collect or enforce such claims, interests, and encumbrances against Buyer.

v.      The Debtors will be authorized in accordance with section 365 of the Bankruptcy Code to (i) sell, assume, assign, and transfer to Buyer the Closing Date Assigned Contracts and Leases pursuant to the provisions of sections 363 and 365 of the Bankruptcy Code, free and clear of any and all claims, interests, and encumbrances (other than the Assumed Liens), and (ii) execute and deliver to Buyer such assignment documents as may be necessary to sell, assign, and transfer the Closing Date Assigned Contracts and Leases.

vi.     The provisions of Bankruptcy Rules 6004(h) and 6006(d) staying the effectiveness of the Sale Order for 14 days will be waived and this Order shall be effective, and the parties may consummate the transactions contemplated by the Asset Purchase Agreement, immediately upon entry.

**Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases**

29.     Within two business days of the entry of the Bid Procedures Order, the Debtors shall serve by first-class mail, postage pre-paid, a copy of the Bid Procedures Order and a notice of the Motion and Sale Hearing, substantially in the form of notice annexed to the Motion as Exhibit D (as such notice may be amended appropriately to conform with the provisions of the Bid Procedures Order) (the "Assigned Contract and Unexpired Lease Notice"), on all non-debtor parties to executory contracts and unexpired leases that may be assumed by the Debtors (to the extent not already assumed) and/or assigned to Buyer in connection with the closing of the Asset Purchase Agreement (the "Assigned Contracts" and the "Unexpired Leases"), with each such notice setting forth the Debtors' calculation of the cure amount, if any, that would be owing to such counterparty if the Debtors assumed such executory contract or unexpired lease and assign it to Buyer.

30.     The Assigned Contract and Unexpired Lease Notice provides ample notice of the relief requested, the relative impact that such relief may have on the counterparties to the

17

US_ACTIVE-103243292.5-JARAHL

Assigned Contracts and Unexpired Leases, and the procedures that such counterparties must follow to respond, participate in the Auction, or otherwise object to the relief requested, as the case may be.

31.     Any interested party seeking to object to (a) the assumption and/or assignment to Buyer, or another bidder providing a higher or otherwise better offer at the Auction, of an Assigned Contract or Unexpired Lease or (b) the validity of the cure amount, if any, set forth in the Assigned Contract and Unexpired Lease Notice, or otherwise assert that any amounts, defaults, conditions, or pecuniary losses as of the Petition Date (including accrued but not yet due obligations) must be cured or satisfied under any of the Assigned Contracts and Unexpired Leases in order for such contract to be assumed and/or assigned (collectively, a "Cure Obligation"), must file and serve an objection (a "Cure Objection") so that such Cure Objection is received by the Service Parties not later than 12:00 noon (Prevailing Eastern Time) on the **March 26, 2010** (the "Cure Objection Deadline"). Cure Objections shall set forth with specificity any and all Cure Obligations or conditions which the objecting party asserts must be cured or satisfied with respect to the subject Assigned Contract or Unexpired Lease, including the cure amount that the objector asserts is due, the specific types and dates of any alleged defaults, pecuniary losses and conditions to assignment, and the support therefore, and all other objections to assumption and/or assignment.

32.     Any non-debtor party to any Assigned Contract or Unexpired Lease that receives notice of the proposed assumption or assignment of such Assigned Contract or Unexpired Lease and does not file and serve a Cure Objection by the Cure Objection Deadline strictly in accordance with this Order (a) shall be deemed (i) to have waived and released any right to assert a Cure Obligation and (ii) to have given the consent contemplated by sections 365(c)(1)(B) and

US_ACTIVE-103243292.5-JARAHL

365(f)(1) of the Bankruptcy Code to the assumption and/or assignment of such Assigned

Contract or Unexpired Lease to Buyer, or another bidder providing a higher or otherwise better

offer at the Auction, upon payment of the cure amounts, if any, specified in the subject Assigned

Contract and Unexpired Lease Notice, and (b) shall be forever barred and estopped from

asserting or claiming against the Debtors, Buyer, or any other assignee of the relevant Assigned

Contract or Unexpired Lease that any additional amounts are due or defaults exist, or conditions

to assignment must be satisfied, under such Assigned Contract or Unexpired Lease.

33.     Hearings with respect to Cure Objections may be held (a) at the Sale Hearing, or

(b) at such other date as the Court may designate; provided, that if the subject Assigned Contract

or Unexpired Lease is assumed and assigned prior to resolution of any Cure Objection, the cure

amount asserted by the objecting party (or such lower amount as may be fixed by the Court)

shall be deposited by Buyer to be held in a segregated account maintained by the Debtors or such

other person as the Court may direct pending further order of the Court or mutual agreement of

the parties.

### Proposed Notice of the Sale Hearing

34.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their

creditors with 21 days' notice of the Sale Hearing.  Pursuant to Bankruptcy Rule 2002(c), such

notice must include the date, time, and place of the Auction and the Sale Hearing, and the

deadline for filing objections to the relief requested herein.  The Debtors propose that the

deadline for objecting to approval of the proposed Sale, including the sale of the Purchased

Assets free and clear of liens, claims, encumbrances and interests pursuant to Section 363 of the

Bankruptcy Code, shall be made by **March 26, 2010 at 12:00 p.m.** (the "Sale Objection

Deadline").

US_ACTIVE-103243292.5-JARAHL

35.     Within two business days of the entry of the Bid Procedures Order, the Debtors

(or their agents) shall serve the Bid Procedures Order, the Dunkin' Purchase Agreement, a copy

of this Order, and a notice, in substantially the form attached as <u>Exhibit D</u> (the "Sale Notice") to

this Motion by hand delivery, facsimile, overnight mail or first-class mail, postage prepaid, upon

all creditors and the (i) all entities known to have an interest in the Purchased Assets; (ii) all

federal, state, and local regulatory or taxing authorities or recording offices which have a known

interest in the relief requested by the Sale Motion; (iii) all non-Debtors parties to executory

contracts and unexpired leases with the Debtors; (iv) the Internal Revenue Service; (v) the

United States Environmental Protection Agency; (vi) the United States Attorney's Office for the

District of Delaware; and (vii) all other entities that have filed requests for notices pursuant to

Bankruptcy Rule 2002.

## RELIEF REQUESTED

36.     By this Motion, the Debtors respectfully request that this Court enter an order

pursuant to Sections 105, 363, 365 and 503 of the Bankruptcy Code, substantially in the forms

attached hereto, (i) approving bidding procedures for the sale of substantially all of their assets,

(ii) approving the form and manner of notice of the sale and assumption and assignment of

executory contracts and leases, (iii) approving the form of asset purchase agreement, (iv)

approving and authorizing the sale of substantially all of the Debtors' assets to the highest and

best bidder free and clear of all liens, interests, claims and encumbrances pursuant to Sections

105, 363, and 365 of the Bankruptcy Code, (v) waiving the requirements of Bankruptcy Rules

6004(g) and 6006(d), (vi) setting auction and hearing dates; and (vii) granting related relief.

## BASIS FOR RELIEF REQUESTED

US_ACTIVE-103243292.5-JARAHL

37.     Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  A debtor must articulate a valid business justification to obtain court approval to proceed with asset sales outside of the ordinary course of business under Section 363(b) of the Bankruptcy Code.  See, e.g., Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (citing Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1991)); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Abbotts Dairies, Inc., 788 F.2d 143, 147-48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of Lionel Corp. and requiring good faith); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the Abbotts Dairies decision); Dai-Icho Kangyo Bank v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (Bankr. D. Del. 1999) (same).  Generally, Third Circuit courts require a debtor to satisfy the four following requirements in connection with a sale under Section 363 of the Bankruptcy Code: "(1) a sound business purpose exists; (2) the sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the purchaser has acted in good faith.  In re Decora Indus., Inc., 2002 WL 32332749 at * 2 (D. Del. May 20, 2002) (citing Del. & Hudson Railway Co., 124 B.R. 169, 176 (D. Del. 1991).

38.     When a debtor demonstrates a valid business justification for a decision, a strong presumption arises "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (holding that the Delaware

21

business judgment rule has "vitality by analogy" in Chapter 11, especially where the debtor is a Delaware corporation) (quotations omitted).

39.     In the instant case, the Debtors have demonstrated that a strong business justification exists for the Sale for several reasons.  First, the Sale will maximize creditor recoveries in these cases by monetizing the Debtors' going concern value for the benefit of the Debtors' creditors.  As such, the Debtors, in their business judgment and in consultation with their legal and financial advisors, have determined the proposed Sale provides the best available method to maximize the value of the Debtors' estates for the benefit of the Debtors' creditors.  In addition, the eventual Successful Bidder likely will continue the Debtors' operations in some form.  It is the Debtors' hope that this will limit any further reductions in their workforce.

## The Bid Procedures are Reasonable and Appropriate

40.     The Debtors believe that the Bid Procedures will ensure that the bidding process is fair and reasonable and will yield the maximum value for their estates and creditors.  The Bid Procedures provide for a straight-forward auction pursuant to which the bidder that submits the highest or otherwise best offer will be selected to as the ultimate purchaser of all or substantially all of the Debtors assets.

41.     In light of the current liquidity issues, the Debtors believe that they must be permitted to conduct the sale process in the manner and on the timetable set forth herein and in the Bid Procedures.

42.     Accordingly, the Debtors believe that the Court should approve the Bid Procedures, including the dates established thereby for, *inter alia*, the Auction and the Sale Hearing.

## The Successful Bidder is a Good Faith Purchaser

US_ACTIVE-103243292.5-JARAHL

43. The Debtors request that the Successful Bidder receive the protections set forth in Bankruptcy Code Section 363(m). Specifically, Bankruptcy Code Section 363(m) provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). While the Bankruptcy Code does not define "good faith," the Third Circuit Court of Appeals previously addressed the meaning of the term:

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

Abbotts Dairies, 788 F.2d at 147.

51. Here, Dunkin' is not an "insider" of the Debtors. Dunkin' is the Debtors' franchisor but is not an insider within the meaning of Section 101(31) of the Bankruptcy Code. The Debtors and Dunkin' have entered into the Term Sheet and will enter into the Agreement without collusion, in good faith and from arm's-length bargaining positions, and, to the Debtors' knowledge, no party has engaged in any conduct that would cause or permit the Term Sheet or the Dunkin' Purchase Agreement to be avoided under Section 363(n) of the Bankruptcy Code. Similarly, the Debtors submit that any sale agreement they enter into with a Successful Bidder other than Dunkin' will also be negotiated at arms-length and in good faith. Accordingly, the Debtors seek a finding that the eventual Successful Bidder is a good faith purchaser under Sections 363(m) and 363(n) of the Bankruptcy Code.

## Approval of Sale Free and Clear of Liens, Claims and Encumbrances

US_ACTIVE-103243292.5-JARAHL

52.     The Debtors request approval to sell their assets free and clear of any and all liens, claims, and encumbrances in accordance with Section 363(f) of the Bankruptcy Code except as specified in the Term Sheet.  Pursuant to Section 363(f) of the Bankruptcy Code, a debtor in possession may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

- applicable nonbankruptcy law permits sale of such property free and clear of such interest;

- such entity consents;

- such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

- such interest is in bona fide dispute; or

- such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

53.     CIT and PECP have consented to the terms as set forth in the Motion.  The Debtors also believe that the service of the sale notice in accordance with the terms set forth in the Bid Procedures Order will afford creditors with sufficient notice of the sale and therefore provides additional justification for approval of the free and clear sale.

**Approval of Assumption and Assignment of Contracts and Unexpired Leases**

54.     The Debtors seek authority to assume and assign executory contracts and unexpired leases in connection with the Sale.  Section 365 of the Bankruptcy Code generally allows a debtor to assume or reject almost any executory contract.  11 U.S.C. § 365(a).  The ability to assume and reject executory contracts allows a debtor to maximize the value of its estate by assuming executory contracts that benefit the estate and rejecting other executory contracts that are a burden on the estate.  L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.), 209 F.3d 291, 298 (3d Cir. 2000); See, e.g., Orion Pictures Corp. v. Showtime

24

Networks Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993) (noting that section 365 of the Bankruptcy Code "permits the trustee or debtor-in-possession, subject to the approval of the bankruptcy court, to go through the inventory of executory contracts of the debtor and decide which ones it would be beneficial to adhere to and which ones it would be beneficial to reject.").

55.     Under Bankruptcy Code Section 365(f), a debtor, after assuming a contract, may assign its rights under the contract to a third party. 11 U.S.C. § 365(f). Section 365(f)(2)(B) requires, however, that adequate assurance of future performance by an assignee exists. 11 U.S.C. § 365(f)(2)(B). The purpose of the adequate assurance requirement is to protect the interests of the non-debtor party to an assigned contract, as Section 365(k) of the Bankruptcy Code relieves a debtor from liability for any breach of a contract that may occur after an assignment. Cinicola v. Scharffeberger, 248 F.3d 110, 120 (3d Cir. 2001). Adequate assurance of future performance is not required for every term of an executory contract, but only such terms that are "material and economically" significant. In re Fleming Companies, Inc., 499 F.3d 300, 305 (3d Cir. 2007).

56.     The Dunkin' Purchase Agreement will require the assumption and/or assignment of certain executory contracts and unexpired leases, or, alternatively, will provide that Dunkin' will have the option to have assigned to Dunkin' certain other executory contracts and unexpired leases, and such actions represent an integral part of the Sale. It is thus an appropriate exercise of business judgment for the Debtors to agree to assume and/or assign the contracts and leases as will be required by the Dunkin' Purchase Agreement.

**Waiver of Fourteen Day Stay Imposed By Bankruptcy Rules 6004(h) and 6006(d)**

US_ACTIVE-103243292.5-JARAHL

57. The Debtors also request that upon entry of the Sale Order, the Court waive the fourteen (14) day stay requirements of Bankruptcy Rules 6004(h) and 6006(d). First, as demonstrated by the facts of these cases and the general economic environment in the restaurant and food industry, it is crucial to the Debtors' bankruptcy cases that the Sale be consummated as soon as possible. Second, the waiver of the fourteen (14) day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) is a condition desired by Dunkin' and the product of extensive arm's length negotiations. For these reasons, the Debtors respectfully submit that the Court waive the fourteen (14) day stay requirements contained in Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

58. The Debtors will serve notice of this Motion upon: (i) the Office of the United States Trustee; (ii) counsel to the Official Committee of Unsecured Creditors; (iii) counsel to CIT; (iv) counsel to Dunkin'; and (v) those parties requesting notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## NO PRIOR REQUEST

59. No previous request for the relief sought in this Motion has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request the entry of orders substantially in the forms attached hereto (i) approving bidding procedures for the sale of substantially all of their assets, (ii) approving the form and manner of notice of the sale and assumption and assignment of executory contracts and leases, (iii) approving the form of asset purchase agreement, (iv) approving and authorizing the sale of substantially all of the Debtors' assets to the highest and best bidder free and clear of all liens, interests, claims and encumbrances pursuant to Sections

US_ACTIVE-103243292.5-JARAHL

105, 363, and 365 of the Bankruptcy Code, (v) waiving the requirements of Bankruptcy Rules 6004(g) and 6006(d), (vi) setting auction and hearing dates; and (vii) granting such other and further relief as is just and proper.

Dated: February 24, 2010  
      Wilmington, Delaware

Respectfully submitted,

REED SMITH LLP

By: */s/ Kathleen A. Murphy*
    Mark W. Eckard (Bar No. 4542)
    Kathleen A. Murphy (Bar No. 5215)
    1201 North Market Street, Suite 1500
    Wilmington, DE 19801
    Telephone: (302) 778-7500
    Facsimile: (302) 778-7575

    and

    J. Andrew Rahl, Jr., Esquire
    599 Lexington Avenue
    New York, NY 10022
    Telephone: (212) 521-5400
    Facsimile: (212) 521-5450

    Counsel to the Debtors and
    Debtors-in-Possession

US_ACTIVE-103243292.5-JARAHL