Section 5.2    Execution and Effect of Agreement.  Buyer has the requisite corporate power and authority to enter into this Agreement and to perform its obligations hereunder, and the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby and the performance of Buyer's obligations hereunder have been duly authorized by all necessary corporate action on the part of Buyer.  This Agreement has been duly executed and delivered by Buyer and constitutes (assuming the due and valid authorization, execution and delivery thereof by the other parties thereto and the entry of approval of this Agreement and the transactions contemplated hereby by the Bankruptcy Court pursuant to the Approval Order) the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

Section 5.3    No Contravention.  Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (i) violate or conflict with any provision of Buyer's certificate of incorporation or bylaws or similar organizational document, (ii) (with or without the giving of notice or the lapse of time or both) violate, or result in a breach of, or constitute a default under, or conflict with, or accelerate the performance required by, any of the terms of any material Contract to which Buyer is a party or by which it is bound, or (iii) violate or conflict with any Order, Governmental Entity or arbitrator, or any Law applicable to Buyer.

Section 5.4    Third Party Approvals.  The execution, delivery and performance by Buyer of this Agreement and the transactions contemplated hereby do not require any consents, waivers, authorizations or approvals of, or filings with, any third Persons which have not been obtained by Buyer.

Section 5.5    Brokers and Finders.  No broker, finder, investment banker, financial advisor, consultant or intermediary is entitled to a broker's, finder's, financial advisor's or similar fee or commission which is payable by Buyer in connection with the transactions contemplated by this Agreement or upon the consummation of the transaction contemplated hereby, or if the Closing does not occur.

Section 5.6    Funds.  Buyer, as of the Closing Time, will have sufficient unrestricted funds to consummate the transactions contemplated by this Agreement.

## ARTICLE VI

## COVENANTS OF THE PARTIES

Section 6.1    Conduct of Business Pending the Closing.  Except as required pursuant to an Order of the Bankruptcy Court (and Seller covenants not to seek entry of such an order except (a) in good faith, (b) as required by the Bankruptcy Code, and (c) following at least three (3) Business Days' Notice to Buyer, and Seller otherwise covenants to oppose any motion or request for the entry of such an order), during the period from the Initial Agreement Date and continuing until the earlier of the termination of this Agreement in accordance with its terms or the Closing, Seller shall use all commercially reasonable efforts to carry on the Business in the ordinary course of

business and, to the extent consistent therewith, use all commercially reasonable efforts to preserve the Business intact and preserve the goodwill of and relationships with Governmental Entities, customers, suppliers, partners, lessors, licensors, licensees, vendors, contractors, distributors, agents, officers and employees and others having business dealings with the Business. Without limiting the generality of the first sentence of this Section 6.1, during the period from the Initial Agreement Date through the Closing Time, Seller shall not without the prior written consent of Buyer:

(a)     abandon any rights under any of the Contracts, Property Leases or Equipment Leases necessary for the Business or abandon any material rights under any Intellectual Property necessary for the Business; terminate, reject, permit to be deemed rejected, amend, modify or supplement the terms of any Contract, Property Leases or Equipment Leases necessary for the Business or terminate, reject, permit to be deemed rejected, amend, modify or supplement the material terms of any Intellectual Property necessary for the Business; or fail to honor or perform, the Contracts, Property Leases or Equipment Leases necessary for the Business or fail to honor or perform, any Intellectual Property necessary for the Business in any material respect; unless and until such Contract shall have become a Removed Contract, such Property Lease shall have become a Removed Real Property Lease or such Equipment Lease shall have become a Removed Equipment Lease;

(b)     other than sales of Inventory in the ordinary course of business or the disposition of obsolete equipment, lease, license, surrender, relinquish, reject, permit to be deemed rejected, sell, transfer, convey, assign, abandon or otherwise dispose of any Purchased Assets or shut down any of the Acquired Leased Properties or Acquired Owned Properties;

(c)     cease operations at any store, other than stores that are Excluded Assets hereunder;

(d)     fail to use commercially reasonable efforts to maintain or acquire Inventory of the types and amounts consistent with the ordinary course of the Business;

(e)     institute, settle or agree to settle any material litigation, action or Proceeding before any court or Governmental Entity relating to the Purchased Assets, or modify in any manner that is adverse to the Business or the Purchased Assets, rescind or terminate a material Permit, allowance, or credit (or application therefor) relating to the Business or the Purchased Assets, excepting any litigation settlement regarding claims of general unsecured creditors in the Case which are unrelated to any interest of Seller in any Purchased Assets;

(f)     transfer or grant any material rights under, modify any existing material rights under, or enter into any settlement regarding the breach or infringement of, or permit to lapse or fail to preserve, or fail to take any action, provide any notice, make any filing, or pay any fee necessary to maintain any Acquired Intellectual Property;

(g)     terminate, cancel or amend any insurance coverage maintained with respect to any Purchased Assets;

(h)     (i) increase in any manner the compensation or benefits of, or pay any bonus or other supplemental or incentive payment to, any employee, (ii) grant any severance or termination pay (other than pursuant to existing agreements of Seller in effect on the Initial Agreement Date) to, or enter into any severance agreement with, any employee, (iii) establish, adopt, enter into or amend any Benefit Plan or other arrangement of Seller, except as may be required to comply with applicable Law, (iv) grant to any employee any awards under any bonus, incentive, performance or other compensation plan or arrangement or Benefit Plan or other arrangement, or (v) hire or discharge any employee making in excess of $20,000 per year;

(i)     fail to use commercially reasonable efforts to prevent any material change in its relationships with its agents, customers or suppliers that relates to the Business, other than in the ordinary course of business consistent with past practice;

(j)     fail to use commercially reasonable efforts to maintain in good repair their business premises, fixtures, machinery, furniture and equipment at the Acquired Leased Properties or Acquired Owned Properties in a manner consistent with prudent business practice;

(k)     enter into any license, lease, sublease or any other form of occupancy agreement with respect to any Acquired Leased Property or Acquired Owned Property or any agreement for the disposition, purchase or acquisition of any Acquired Leased Property or Acquired Owned Property, or cause a lessor or sublessor to accelerate or prepay any rent or any landlord allowances with respect to any Acquired Leased Property or Acquired Owned Property;

(l)     modify, amend, terminate, assign, sublet or extend the term of any Property Lease or Equipment Lease related to the Business; provided, however, that with respect to each such Property Lease and Equipment Lease, Seller shall provide Buyer with at least thirty (30) days' written notice prior to the expiration of any period within which a renewal option for such lease shall expire; in the event that Buyer provides Seller, at least five (5) days prior to the expiration of any such renewal exercise period, with written instruction to exercise any such renewal option, then (and only in such event) such renewal option shall be exercised;

(m)     enter into, modify, amend, terminate, assign, extend or permit any renewal notice period or option to lapse with respect to any Material Contract related to the Business;

(n)     fail to use commercially reasonable efforts to comply with Buyer's marketing plan for the markets covered by the Territories, which marketing plan shall be commercially reasonable in scope and expense;

(o)     move any Equipment or Inventory that is located at or relates to the Acquired Leased Properties or Acquired Owned Properties to Non-Acquired Real Property; or

(p)     enter into any Contract to do any of the foregoing.

This Section 6.1 as well as any representation, warranty, covenant, schedule or closing condition contained in this Agreement shall not apply to any Excluded Assets from and after the date that such assets are designated by Buyer as being Excluded Assets, except, however, to the extent a provision of this Section 6.1 or such representation, warranty, covenant, schedule or closing condition makes specific reference to an Excluded Asset (or category of Excluded Assets) or to operations relating to an Excluded Asset (or category of Excluded Assets) (including, in the case of a closing condition, where a closing condition is based upon such representation, warranty, covenant or schedule). Similarly, assets that become Purchased Assets shall be added in writing as appropriate to schedules to this Agreement.

Section 6.2     Bankruptcy Court Order.

(a)     Seller shall use commercially reasonable efforts to obtain prompt entry of an Order (the "Procedures Order") allowing the Procedures Motion. The Procedures Order shall be in the form attached as Exhibit B to the Procedures Motion or in a form otherwise acceptable to Buyer in its sole discretion.

(b)     Each of the parties hereto agrees to file this Agreement with the Bankruptcy Court promptly following execution by the parties.

(c)     Seller shall use commercially reasonable efforts to obtain, through the filing with the Bankruptcy Court of appropriate applications or motions (the "Sale Motion"), entry of an Order granting the Approval Order, on or before March 3, 2010 and following notice to creditors and parties in interest in accordance with the Bankruptcy Code and Bankruptcy Rules.

(d)     In the event the Closing shall have occurred and the Approval Order shall be appealed, Seller shall (at Seller's expense) defend such appeal.

Section 6.3     Released Locations; Competitive Bidding.

(a)     Released Locations. Buyer shall file a list under seal with the Bankruptcy Court of the release prices (the "Release Prices") for each Territory and individual store for all stores located in each of the Territories for which any Qualified Franchisee may purchase such stores and/or Territories pursuant to a Competing Agreement if the Competing Agreement is a successful bid (the "Released Locations"), in which event Buyer or its affiliates will enter into a new franchise agreement with such Qualified Franchisee covering such stores or Territory and any existing franchise agreement with the Seller for such store or Territory will be deemed rejected as of the Closing Time. Nothing herein shall constitute a consent by the Buyer or its Affiliates or a waiver of rights under any existing franchise agreement as to any existing or proposed

new franchisee other than and excepting only as provided above with respect to Qualified Franchisees.

       (b)    Competitive Bidding. During the Competitive Bidding Period, subject to the terms of the Procedures Order, Seller will have the responsibility and obligation to solicit Competing Agreements, respond to any inquiries or offers to acquire the Purchased Assets and to perform any and all other acts reasonably related thereto which are required under the Bankruptcy Code or other applicable law. Seller shall as promptly as practicable, and in no event later than March 25, 2010, notify Buyer of the existence of any competing bid for any portion of the Purchased Assets, and Seller shall as promptly as practicable, and in no event later than March 25, 2010, provide to Buyer a copy of the proposal and all documentation for, or if not in writing, the material terms of, any such competing bid.

       Section 6.4    Notification of Certain Matters. Seller shall give Notice to Buyer on the same day any of the following are received of (i) any written notice or other communication from any Person alleging that the consent of such Person which is or may be required in connection with the transactions contemplated by this Agreement is not likely to be obtained prior to Closing, and (ii) any written objection or Proceeding that challenges the transactions contemplated hereby or the entry of the Approval Order. Seller shall give Notice to Buyer on the same day any of the following are received of (a) any notice of any alleged violation of Law applicable to the Seller of which it has Knowledge; (b) any written notice of the commencement of any investigation, inquiry or review by any Governmental Entity with respect to the Business or that any such investigation, inquiry or review, to the Knowledge of Seller, is contemplated; (c) the resignation of any employee at the Acquired Leased Properties or Acquired Owned Properties; and (d) any destruction or significant damage to the Acquired Leased Properties or Acquired Owned Properties or any Equipment contained therein, whether caused by natural disaster or otherwise. Buyer shall give immediate Notice to Seller, and Seller shall give immediate Notice to Buyer, in the event that either party becomes aware of any event which would reasonably be expected to (x) have a Material Adverse Effect or (y) provide such party with the ability to terminate the Agreement pursuant to 9.1(b)(iii) or 9.1(c)(iii), as applicable.

       Section 6.5    Access.

       (a)    Subject to applicable Law, from the Initial Agreement Date until the Closing Time, Seller (i) shall give Buyer and its Representatives access during normal business hours to the offices, properties, officers, employees, accountants, auditors, counsel (other than counsel to Seller in connection with the Case) and other representatives, books and records of Seller, (ii) shall furnish to Buyer and its Representatives such financial, operating and property related data and other information as such persons request, and (iii) shall instruct Seller's employees, counsel and financial advisors to reasonably cooperate with Buyer in its investigation of the Business. In addition, Buyer shall have the right to contact and negotiate directly with Seller's landlords, lessors, suppliers and other third parties with respect to any Purchased Assets or Assumed Liabilities.

(b)     From and after the Closing Time, Seller shall give Buyer and
Buyer's Representatives access during normal business hours to the offices, facilities,
plants, properties, officers, employees, books and records of Seller pertaining to the
Business, and Seller shall cause their Representatives to furnish to Buyer such financial,
technical, operating and other information pertaining to the Business as Buyer's
Representatives shall from time to time request and to discuss such information with such
Representatives. Seller shall use commercially reasonable efforts to cooperate with
Buyer as may be requested by Buyer for purposes of (i) conducting an audit of the
Business, including access to the Company's independent auditors' working papers
pertaining to the Business or the Purchased Assets and (ii) undertaking at Buyer's
expense, any study of the condition or value of the Purchased Assets including any
environmental assessment; and Seller acknowledges that information or access may be
requested and used for such purpose.

Section 6.6     Confidentiality; Privacy.

(a)     Seller will treat and hold as confidential all of the Confidential
Information and will not, directly or indirectly, without the prior written consent of
Buyer, disclose or use any Confidential Information except in connection with this
Agreement and as provided in paragraph (i):

(i)     Seller's obligation not to disclose Confidential Information shall
not apply to Confidential Information that Seller determines, in consultation with
counsel, is required to be disclosed by Law; provided, however, that Seller shall
notify Buyer as promptly as possible (and, if possible, prior to making such
disclosure) so that Buyer may seek confidential treatment or protection of such
Confidential Information.

(b)     Notwithstanding anything else in this Agreement, all parties to this
Agreement hereby agree and acknowledge that each of them (and each of their
Representatives) is authorized to disclose to any and all Persons, beginning immediately
upon commencement of their discussions and without limitation of any kind, the United
States federal income tax treatment and tax structure of the transactions contemplated by
this Agreement, and all materials of any kind (including opinions or other tax analyses)
that are provided by either party to the other relating to such United States federal income
tax treatment and tax structure, except to the extent that such disclosure is subject to
restrictions reasonably necessary to comply with securities laws.

Section 6.7     Public Announcements.  From the Initial Agreement Date
until the earlier of the Closing or the termination of this Agreement, the Seller will
consult with the Buyer and receive the Buyer's written consent before issuing, and
provide Buyer the opportunity to review and comment upon, any press release, any court
filing or pleading filed with the Bankruptcy Court relating primarily to this Agreement or
the transactions contemplated hereby, or other public statements with respect to the
transactions contemplated by this Agreement, and Seller shall not issue any such press
release or make any such public statement without the prior written approval of Buyer, in
each case except as may be required by Law, court process or by obligations pursuant to

any listing agreement with any national securities exchange. Seller shall use its commercially reasonable efforts to cause its Affiliates, employees, officers and directors to comply with this Section 6.7.

Section 6.8 Cure of Defaults. Subject to the Approval Order, Seller shall, on or prior to the Closing, cure any and all material defaults and breaches under and satisfy any material Liability arising from or relating to pre-Closing periods under the Assumed Contracts, Assumed Real Property Leases and Assumed Equipment Leases so that such Assumed Contracts, Assumed Real Property Leases and Assumed Equipment Leases intended to be assumed by Buyer as of the Closing in accordance with this Agreement may be assumed by Seller and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement. Seller agrees that it will promptly take such actions as are necessary or desirable to obtain a Final Order of the Bankruptcy Court providing for the assumption and assignment of the Assumed Contracts, Assumed Real Property Leases and Assumed Equipment Leases.

Section 6.9 Employment Matters. Buyer or an Affiliate of Buyer may offer employment, effective as of the Closing Time, to certain of the Identified Employees as determined by Buyer on such terms as Buyer or an Affiliate of Buyer shall determine in its sole discretion and in accordance with Buyer's hiring practices; provided, however, that Buyer shall not have any obligation to assume any severance, retention or other similar contractual provision of any Identified Employee that is offered employment by Buyer. Seller shall terminate the employment of all of the employees of the Business including all Identified Employees to whom Buyer intends to make an offer immediately prior to the Closing Time and shall comply with any and all requirements of the WARN Act or any similar state law applicable to Seller in connection therewith. For purposes of the WARN Act and this Section 6.9, "Closing Time" shall mean the "effective date" of the transaction contemplated by this Agreement, as defined in the WARN Act. Each Identified Employee who accepts an offer of employment from Buyer or an Affiliate of Buyer shall be deemed to be a hired employee ("Hired Employee") on the day such employee commences active employment with Buyer or an Affiliate of Buyer (not earlier than the Closing Time).

Section 6.10 Further Agreements. Seller shall use all commercially reasonable efforts to promptly deliver to Buyer any mail or other communication received by Seller after the Closing Time pertaining to the Purchased Assets, the Business or the Assumed Liabilities, and any cash, checks or other instruments of payment in respect thereof. Buyer shall use all commercially reasonable efforts to promptly deliver to Seller any mail or other communication received by it after the Closing Time pertaining to the Excluded Assets or any Excluded Liabilities, and any cash, checks or other instruments of payment in respect thereof. From and after the Closing Time, Seller shall use all commercially reasonable efforts to refer all inquiries with respect to the Business, the Purchased Assets and the Assumed Liabilities to Buyer, and Buyer shall use all commercially reasonable efforts to refer all inquiries with respect to the Excluded Assets and the Excluded Liabilities to Seller.

Section 6.11    Payment of Transfer Taxes and Tax Filings. All Transfer Taxes arising out of the transfer of the Purchased Assets and any Transfer Taxes required to effect any recording or filing with respect thereto shall be borne one-half by Buyer and one-half by Seller. The Transfer Taxes shall be calculated assuming that no exemption from Transfer Taxes is available, unless otherwise indicated in the Approval Order or, at Closing, Seller or Buyer, as appropriate, provides an appropriate resale exemption certificate or other evidence acceptable to Buyer or Seller, as appropriate, of exemption from such Transfer Taxes. Seller and Buyer shall cooperate to timely prepare and file any Tax Returns relating to such Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes. Seller shall pay all Transfer Taxes and shall file all necessary documentation and returns with respect to such Transfer Taxes when due, and shall promptly, following the filing thereof, furnish a copy of such return or other filing and a copy of a receipt showing payment of any such Transfer Tax to Buyer, and Buyer shall promptly reimburse Seller one-half thereof pursuant to the first sentence of this Section. Each party hereto shall furnish or cause to be furnished to the other, upon request, as promptly as practicable, such information and assistance relating to the Purchased Assets and the Business as is reasonably necessary for filing of all Tax Returns, including any claim for exemption or exclusion from the application or imposition of any Taxes or making of any election related to Taxes, the preparation for any audit by any taxing authority and the prosecution or defense of any claim, suit or proceeding relating to any Tax Return.

Section 6.12    Utilities. To the extent practicable, the parties hereto shall notify the gas, water, sewage treatment, telephone and electric utility companies that Buyer shall be responsible for the payment of all obligations of the Business or the Purchased Assets incurred therefor on or after the Closing Time. Buyer shall be responsible for the payment of all charges for such services incurred after the Closing Time. Seller shall be responsible, as debtors-in-possession, for the payment of all charges for such services incurred from and after the Petition Date through the Closing Time. Seller shall use commercially reasonable efforts to cause the telephone companies to render a bill for telephone service incurred from and after the Petition Date to and including the Closing Time, and Seller shall be responsible for the payment of such bill.

Section 6.13    Proration of Taxes and Certain Charges.

(a)    All real property Taxes, personal property Taxes or similar *ad valorem* obligations (and no other Taxes) levied with respect to the Purchased Assets for any taxable period that includes a day before the Closing Date and ends after the Closing Date, whether imposed or assessed before or after the Closing Date, shall be prorated between Seller and Buyer as of the Closing Date. Seller shall be responsible for the payment of all Taxes incurred or accrued through the Closing Date and Buyer shall be responsible for the payment of all Taxes incurred or accrued after the Closing Date. If any such Taxes subject to proration are paid by Buyer, on the one hand, or Seller, on the other hand, the proportionate amount of such Taxes paid (or in the event a refund of any portion of such Taxes previously paid is received, such refund) shall be paid promptly by (or to) the other after the payment of such Taxes (or promptly following the receipt of any such refund).

(b)     Except as otherwise expressly provided herein, all installments of special assessments or other charges on or with respect to the Purchased Assets payable by Seller for any period in which the Closing Date shall occur, including base rent, common area maintenance, royalties, all municipal, utility or authority charges for water, sewer, electric or gas charges, garbage or waste removal, and cost of fuel, shall be apportioned as of the Closing Date and each party shall pay its proportionate share promptly upon the receipt of any bill, statement or other charge with respect thereto. Seller shall be responsible for the payment of all charges incurred or accrued through the Closing Date. If such charges or rates are assessed either based upon time or for a specified period, such charges or rates shall be prorated as of the Closing Date. If such charges or rates are assessed based upon usage of utility or similar services, such charges shall be prorated based upon meter readings taken on the Closing Date.

Section 6.14   Commercially Reasonable Efforts; Notification.

(a)     Each of the parties will use all commercially reasonable efforts to take, or cause to be taken, all actions and use all commercially reasonable efforts to do, or cause to be done, and to assist and cooperate with the other parties in doing, all things which to its Knowledge are necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement, including: (i) the obtaining of all other necessary actions, non-actions, waivers, and Permits from Governmental Entities and the making of all other necessary registrations and filings, (ii) the obtaining of all necessary consents, approvals or waivers from third parties (which in the case of Buyer shall not require Buyer to assume any Liability or incur any expense other than with respect to Buyer Cure Amounts), and (iii) the execution and delivery of any additional certificates, agreements, instruments, reports, schedules, statements, consents, documents and information necessary to consummate the transactions contemplated by this Agreement.

(b)     Except as required by Law, each party hereto shall promptly inform the other of any communication from any Governmental Entity regarding any of the transactions contemplated by this Agreement. If any party hereto or Affiliate thereof receives a request for additional information or documentary material from any such Government Entity with respect to the transactions contemplated by this Agreement, then such party will use its reasonable efforts to make, or cause to be made, as soon as reasonably practicable and after consultation with the other party, an appropriate response in compliance with such request.

Section 6.15   Rejected Contracts.  Seller shall not reject or permit to be deemed rejected any Assumed Contract, Assumed Real Property Lease or Assumed Equipment Lease, without the prior written consent of Buyer.

Section 6.16   Adequate Assurances.  Buyer will upon request of Seller use commercially reasonable efforts in communicating with third parties to Assumed Contracts, Assumed Real Property Leases or Assumed Equipment Leases as may be reasonably necessary to assist Seller in establishing that Buyer has satisfied the requirement of adequate assurance of future performance contained in sections

365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts, Assumed Real Property Leases and Assumed Equipment Leases.

Section 6.17    Further Assurances.  Subject to the terms and conditions herein provided, following the Closing Time, Seller shall execute and deliver to Buyer such bills of sale, endorsements, assignments and other good and sufficient instruments of assignment, transfer and conveyance, in form and substance reasonably satisfactory to Buyer, as shall be reasonably requested to vest in Buyer all of Seller's right, title and interest in and to the Purchased Assets.  Seller shall take such reasonable steps as may be reasonably necessary or appropriate at and after the Closing, so that Buyer shall be placed in actual possession and operating control of the Purchased Assets.  Seller shall provide copies or otherwise make available to Buyer and Buyer's Representatives, all information and records (financial and otherwise) relating to, or otherwise used or useful in the Business, and not otherwise included in the Purchased Assets.

Section 6.18    Regulatory Approval.

(a)    Seller and Buyer will use commercially reasonable efforts to obtain all authorizations, consents, orders and approvals of all federal, state and foreign regulatory bodies and officials that may be or become necessary for the performance of its obligations pursuant to this Agreement or the Assumption Agreement and will cooperate fully with the other party in promptly seeking to obtain all such authorizations, consents, orders and approvals.  Neither Seller nor Buyer will take any action that will have the effect of delaying, impairing or impeding the receipt of any required approval.

(b)    If, in order to properly prepare documents required to be filed with governmental authorities or its financial statements, it is necessary that either Seller or Buyer be furnished with additional information relating to the Business, the Purchased Assets or the Assumed Liabilities, and such information is in the possession of the other party, such party agrees to use commercially reasonable efforts to furnish such information in a timely manner to such other party, at the cost and expense of the party being furnished such information.

Section 6.19    [reserved]

Section 6.20    Post-Closing Reconciliation.  With respect to any and all amounts received or collected from and after the Closing by the Seller attributable to, or in respect of, any of the Purchased Assets or by Buyer attributable to, or in respect of, any of the Excluded Assets, Seller or Buyer, as the case may be, shall (i) hold such amounts in trust for and on behalf of the other party, (ii) provide prompt notice of such receipt or collection to the other party, (iii) pay promptly (and in any event within 2 Business Days of their receipt or collection) to the other party any and all such amounts so received or collected by wire transfer of immediately available funds to an account or accounts designated by the other party or by other means acceptable to the other party.

Section 6.21    Carve-Out.  If Buyer is the successful bidder for one or more stores in the Case and the Official Committee of Unsecured Creditors (the

"Committee") supports such transaction, Dunkin' Brands, Inc. will at Closing assign to the Seller's estate for the benefit of (i) non-lender general unsecured creditors and (ii) unpaid fees and expenses of Committee professionals in excess of $125,000, its right to repayment of $250,000 of the CML Subsidy Loans and CML Subsidy Loan Obligations (as such terms are defined in that certain Amended and Restated DIP Financing, Ratification and Intercreditor Agreement dated as of July 2009 (the "DIP Agreement") by and among Seller, the Lenders and the other parties thereto, as amended and in effect) (the "Carve-Out"). If Buyer is the successful bidder for one or more Stores, Dunkin' Brands, Inc. will also: (i) waive its right to repayment of the remaining $238,693 of the CML Subsidy Loans and CML Subsidy Loan Obligations; (ii) waive its right to repayment of obligations under the DIP Agreement, including but not limited to, the Dunkin' Debt (as defined therein); (iii) release the Seller from any obligations with respect to pre-petition mortgages granted to Dunkin' Brands, Inc.; and (iv) waive its right to assert any claim against the Purchase Price, the Carve-Out and/or the Excluded Assets.

Section 6.22    Equipment Handling.  The Seller shall provide reasonable cooperation to the Buyer with respect to all matters regarding any Assumed Leased Equipment leased to Seller by Buyer.

Section 6.23    Mutual Releases.  Seller and Buyer shall use their reasonable best efforts to obtain mutual releases (the "Mutual Release") from each of the entities included within the Seller, CIT Group/Equipment Financing, Inc. ("CIT"), Kainos Investment Partners I, LLC, Kainos Investment Partners II, LLC, and PCEP II KPHC Holdings, Inc., on the one hand, and Buyer on the other, of each other, and all of their respective officers, directors, affiliates, stockholders, employees, agents, and representatives, from all claims, causes of action, rights, and remedies with respect to all matters relating to the Seller other than and excepting claims, causes of action, rights, and remedies that arise under (i) that certain Program Agreement (and related amendments) dated as of March 1, 1995 among Dunkin' Donuts, Incorporated, Baskin-Robbins Incorporated and The CIT Group/Equipment Financing, Inc., (ii) that certain Vendor Finance Program Agreement (and related amendments) dated as of June 1, 2007 between Dunkin' Brands, Inc., CIT Small Business Lending Corporation and The CIT Group/Equipment Financing Inc., and (iii) this Agreement.

Section 6.24    Seller Cure Amounts.  Seller shall use commercially reasonable efforts to contest any claim for Seller Cure Amounts presented to the Bankruptcy Court.

## ARTICLE VII

## CONDITIONS TO OBLIGATIONS OF THE BUYER

Section 7.1    Conditions Precedent to Obligations of Buyer.  The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by Buyer in Buyer's sole discretion) at or prior to the Closing Time of each of the following conditions:

(a)     Accuracy of Representations and Warranties. Each of the representations and warranties of Seller contained herein shall be true and correct in all material respects on the Initial Agreement Date and, other than with respect to the Excluded Assets, shall be true and correct in all material respects on and as of the Closing Time, with the same force and effect as though such representations and warranties had been made on and as of the Closing Time, except to the extent that any such representation or warranty is expressly made as of a specified date or relates to Excluded Assets, in which case such representation or warranty shall have been true and correct as of such date.

(b)     Performance of Obligations. Seller shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by them on or prior to the Closing Time.

(c)     Officer's Certificate. Buyer shall have received a certificate, dated the Closing Time, of an executive officer of Seller, identifying any failure of any representation or warranty that is not true and correct on and as of the Closing Time and otherwise to the effect that the conditions specified in Section 7.1(a) and Section 7.1(b) above have been fulfilled.

(d)     Bankruptcy Court Approval. The Bankruptcy Court shall have entered an Order or Orders (the "Approval Order") in the form attached as Exhibit C to the Procedures Motion or in a form otherwise acceptable to Buyer in its sole discretion, which, among other things, (i) approves, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, with such changes only as are mutually approved by Buyer and Seller: (A) the execution, delivery and performance by Seller of this Agreement, including each and every term and condition hereof, and the other instruments and agreements contemplated hereby, (B) the sale of the Purchased Assets to Buyer on the terms set forth herein free and clear of all Liens (other than Permitted Liens), claims and interests, in, to and under each and all of the Purchased Assets, and (C) the performance by Seller of its obligations under this Agreement; (ii) authorizes and directs Seller to assume (to the extent not already assumed) and assign to Buyer the Assumed Contracts, Assumed Real Property Leases, Assumed Equipment Leases and other Purchased Assets; and (iii) finds that Buyer is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code. The Approval Order shall be in full force and effect and as of the Closing shall not be stayed, enjoined or modified. Seller shall have delivered to Buyer (i) a certified copy of the Order or Orders providing for Bankruptcy Court approval, and (ii) copies of all affidavits of service of Seller's motion seeking the Approval Order or notice of such motion filed by or on behalf of Seller.

(e)     Third Party Approvals. Any consents, approvals, waivers and permits from third parties and governmental and regulatory authorities (i) identified on Schedule 4.3 and Schedule 4.4, and (ii) with respect to any other material Purchased Asset not delivered to Buyer prior to the Initial Agreement Date, shall have been obtained.

(f)   Assumed Contracts and Leases.  Except to the extent inconsistent with any order of the Bankruptcy Court, all of the Assumed Contracts, Assumed Real Property Leases and Assumed Equipment Leases shall (i) be in full force and assignable to and assumable by Buyer without the consent of the other party thereto pursuant to Section 365 of the Bankruptcy Code or consent thereto shall have been obtained, and (ii) have had all of Seller's breaches, defaults and Liabilities thereunder arising from or relating to pre-Closing periods satisfied and cured in accordance with Section 6.8 hereof.

(g)   No Material Adverse Change.  Other than the filing of the Case, since February 24, 2010, no event, occurrence, fact, condition, change, development or effect shall have occurred or shall exist that, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect.

(h)   No Violation of Law or Orders.  No provisions of any applicable Law or Order enacted, entered, promulgated, enforced or issued by any Governmental Entity shall be in effect that (i) prevents, renders illegal or otherwise prohibits the sale and purchase of the Purchased Assets or any of the other transactions contemplated by this Agreement or (ii) would adversely affect or interfere with the operation of the Business in any material respect.

(i)   Purchased Assets.  No properties, assets and rights used or held by Seller for use in the Business, or owned by Seller (and not an Excluded Asset) as may in Buyer's reasonable opinion be necessary to conduct the Business, shall be excluded from the Purchased Assets due to Seller's inability to assign such Contracts, Permits, or other properties, assets or rights, whereby the non-assignability thereof, individually or in the aggregate, would reasonably be expected to material to the Business.

(j)   Mutual Releases.  The Mutual Release shall have been executed and delivered by all parties contemplated to be party thereto.

(k)   Title Insurance.  Prior to the Closing Buyer shall have obtained, at its expense, a commitment (which provides that it will remain in effect until at least 30 days after the Closing Date) from a national title insurance company selected by Buyer to issue an ALTA extended coverage owner's policy of title insurance, insuring marketable fee simple title in and to each Acquired Owned Property to be vested in Buyer (or the applicable Buyer Real Estate Entity), subject only to those title exceptions that constitute Permitted Liens hereunder.

## ARTICLE VIII

## CONDITIONS TO OBLIGATIONS OF THE SELLER

Section 8.1   Conditions Precedent to the Obligations of Seller.  The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by Seller) at or prior to the Closing Time of each of the following conditions:

(a)    Accuracy of Representations and Warranties. The representations and warranties of Buyer contained herein shall be true and correct in all material respects on the Initial Agreement Date and shall be true and correct in all respects on and as of the Closing Time, with the same force and effect as though such representations and warranties had been made on and as of the Closing Time, except to the extent that any such representations or warranty is made as of a specified date, in which case such representation or warranty shall have been true and correct as of such date; provided, however, that the failure of any such representations or warranties to be true and correct on and as of the Closing Time shall not constitute a basis for Seller to refuse to consummate the transactions contemplated hereby unless such failure, either individually or in the aggregate, has or would reasonably be expected to have a material and adverse affect on Buyer's ability to perform its obligations under this Agreement.

(b)    Performance of Obligations. Buyer shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it prior to or on the Closing Time.

(c)    Officer's Certificate. Seller shall have received a certificate, dated the Closing Time, of an officer of Buyer to the effect that the conditions specified in Section 8.1(a) and (b) above have been fulfilled.

(d)    Approval Order. The Approval Order (or orders) shall have been entered by the Bankruptcy Court in the form attached as Exhibit C to the Procedures Motion or in a form otherwise acceptable to Buyer in its sole discretion, which, among other things, (i) approves, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, with such changes only as are mutually approved by Buyer and Seller: (A) the execution, delivery and performance by Seller of this Agreement, including each and every term and condition hereof, and the other instruments and agreements contemplated hereby, (B) the sale of the Purchased Assets to Buyer on the terms set forth herein free and clear of all Liens (other than Permitted Liens), claims and interests, in, to and under each and all of the Purchased Assets, and (C) the performance by Seller of its obligations under this Agreement; (ii) authorizes and directs Seller to assume (to the extent not already assumed) and assign to Buyer the Assumed Contracts, Assumed Real Property Leases, Assumed Equipment Leases and other Purchased Assets; and (iii) finds that Buyer is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code. The Approval Order shall be in full force and effect and as of the Closing shall not be stayed, enjoined or modified.

(e)    No Violation of Law or Orders. No provisions of any applicable Law or Order enacted, entered, promulgated, enforced or issued by any Governmental Entity shall be in effect that prevents, renders illegal or otherwise prohibits the sale and purchase of the Purchased Assets or any of the other transactions contemplated by this Agreement.

(f)    Mutual Releases. The Mutual Release shall have been executed and delivered by all parties contemplated to be party thereto.

## ARTICLE IX

## TERMINATION

Section 9.1    Termination of Agreement.  This Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing:

        (a)    by written agreement of Seller and Buyer;

        (b)    by Buyer:

        (i)    at any time after April 1, 2010, if the Closing shall not have occurred; provided, however, that Buyer is not in material and willful breach of any of its representations and warranties contained in this Agreement and has not failed in any material respect to perform any of its obligations hereunder (including, without limitation, Buyer's obligation to close pursuant to Section 3.1 hereof);

        (ii)    if any Order permanently restraining, prohibiting or enjoining Buyer or Seller from consummating the transactions contemplated hereby is entered and such Order shall have become a Final Order;

        (iii)    if (x) there shall have been a breach by Seller of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 7.1, and such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured within ten (10) days after written Notice thereof shall have been received by the Company or, (y) if Buyer elects to terminate this Agreement pursuant to Section 10.4(c);

        (iv)    at any time after March 2, 2010, if (A) the Bankruptcy Court shall not have entered the Procedures Order, or (B) after its entry, the Procedures Order shall fail to be in full force and effect or shall have been stayed, reversed, modified or amended in any respect without the prior written consent of Buyer;

        (v)    at any time after March 31, 2010, if the Approval Order shall not have been entered; or

        (vi)    upon entry of an Order of the Bankruptcy Court or other court of competent jurisdiction approving any competing bid for all or a substantial portion of the Purchased Assets;

        (c)    by Seller:

        (i)    if any Order permanently restraining, prohibiting or enjoining Buyer or Seller from consummating the transactions contemplated hereby is entered and such Order shall have become a Final Order;

(ii)     if there shall have been a breach by Buyer of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 8.1, and such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured within ten (10) days after written Notice thereof shall have been received by Buyer; or

(iii)    upon entry of an Order of the Bankruptcy Court or other court of competent jurisdiction approving a competing bid for all or a substantial portion of the Purchased Assets.

Section 9.2     Consequences of Termination.  If this Agreement is terminated under Section 9.1, written notice thereof will forthwith be given to the other party and this Agreement will thereafter become void and have no further force and effect and all further obligations of Seller and Buyer to each other under this Agreement will terminate without further obligation or liability of Seller or Buyer to the other, except that:

(a)     each party will return or destroy all documents, workpapers and other material of any other party relating to the transactions contemplated by this Agreement, whether so obtained before or after the execution of this Agreement, to the party furnishing the same; and

(b)     notwithstanding the foregoing, this Section 9.2 and Section 6.7 (Public Announcements), Section 10.1 (Expenses), Section 10.5 (Notices), Section 10.6 (Choice of Law), Section 10.8 (Acknowledgment and Release), Section 10.12 (Exclusive Jurisdiction), Section 10.13 (Waiver of Right to Trial by Jury) and Section 10.14 (Beneficiaries) shall survive any such termination of this Agreement.

## ARTICLE X

### MISCELLANEOUS

Section 10.1     Expenses.  Except as set forth in this Agreement and whether or not the transactions contemplated hereby are consummated, each party hereto shall bear all costs and expenses incurred or to be incurred by such party in connection with this Agreement and the consummation of the transactions contemplated hereby.  As between Buyer and Seller, Seller shall bear all costs of for Professional Expenses of any Persons (other than Buyer, its agents or Affiliates) entitled to reimbursement by the Debtors' estates in the Case.

Section 10.2     Assignment.  Neither this Agreement nor any of the rights or obligations hereunder may be assigned by Seller without the prior written consent of Buyer, or by Buyer without the prior written consent of Seller; provided, that Buyer may assign its rights and liabilities hereunder in whole or in part to one or more Affiliates of Buyer, which assignment shall not relieve Buyer of its obligations hereunder.  Subject to

the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

Section 10.3 Parties in Interest. This Agreement shall be binding upon and inure solely to the benefit of Seller and Buyer, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement except as expressly set forth herein. Without limiting the foregoing, no direct or indirect holder of any equity interests or securities of either Seller or Buyer (whether such holder is a limited or general partner, member, stockholder or otherwise), nor any Affiliate of either Seller or Buyer, nor any Representative, or controlling Person of each of the parties hereto and their respective Affiliates, shall have any liability or obligation arising under this Agreement or the transactions contemplated hereby.

Section 10.4 Risk of Loss.

(a) Casualty. Seller will bear all risk of loss occurring to or upon any portion of the Purchased Assets prior to the Closing Time. In the event that any material portion of any Purchased Assets is damaged or destroyed prior to Closing Time, then with respect to such Purchased Assets Buyer may, at Buyer's option, either (i) proceed to close notwithstanding the damage or destruction of such Purchased Assets with an adjustment to the Purchase Price as set forth below in this Section 10.4(a); or (ii) exclude such Purchased Assets, in which event Buyer shall have no obligation to close if as a consequence of the exclusion of such Purchased Assets any condition to Closing in Section 7.1 would not be satisfied. If Buyer closes notwithstanding a material unrepaired or unrestored loss to a Purchased Asset, Seller will deliver and/or assign to Buyer any insurance proceeds with respect to such damage or destruction, and all claims against third parties relating thereto, and the adjustment to the Purchase Price shall be limited to the amount of any deductible or self-insured retention under the applicable policies of insurance. A termination pursuant to this Section 10.4(a) shall constitute a termination under Section 9.1(b)(iii).

(b) Condemnation. In the event that any portion of the Purchased Assets is taken by eminent domain or condemnation prior to the Closing Time and such taking materially and adversely affects the use or utility of the Business, Buyer may within the later of (x) ten (10) days after it receives written notice of such taking or (y) two (2) days after the Auction Date either (i) proceed to close notwithstanding the eminent domain or condemnation proceeding, in which event Seller will assign to Buyer their entire right, title and interest in and to any award, with a reduction in the Purchase Price equal to the value of the Purchased Assets impacted by such proceeding; or (ii) exclude such Purchased Asset, in which event Buyer shall have no obligation to close if as a consequence of the exclusion of such Purchased Assets any condition to Closing in Section 7.1 is not satisfied or, if Buyer chooses to do so, purchase the remaining Purchased Assets with a reduction in the Purchase Price equal to the value of the remaining Purchased Assets subject to condemnation. If Buyer closes notwithstanding a condemnation of an Purchased Asset, Seller will deliver and/or assign to Buyer any

proceeds with respect to such condemnation. A termination pursuant to this Section 10.4(b) shall constitute a termination under Section 9.1(b)(iii).

(c)     <u>Rejected Leases</u>. In the event that any Assumed Real Property Lease is or has been rejected by Seller or deemed rejected under Section 365(d)(4) of the Bankruptcy Code prior to the Closing Time, Buyer may, at Buyer's option, within the later of (x) ten (10) days after Buyer receives written notice of such rejection or (y) two (2) days after the Auction Date either: (i) terminate this Agreement, or (ii) proceed to close notwithstanding the rejection of the Property Lease. A termination pursuant to this Section 10.4(c) shall constitute a termination under Section 9.1(b)(iii).

Section 10.5   <u>Notices</u>. All notices, demands, requests, consents, approvals or other communications (collectively, "<u>Notices</u>") required or permitted to be given hereunder or that are given with respect to this Agreement shall be in writing and shall be personally served, delivered by a nationally recognized overnight delivery service with charges prepaid, or transmitted by hand delivery, or facsimile, addressed as set forth below, or to such other address as such party shall have specified most recently by written Notice. Notice shall be deemed given on the date of service or transmission if personally served or transmitted by facsimile with confirmation of receipt; <u>provided</u>, that if delivered or transmitted on a day other than a Business Day or after normal business hours, notice shall be deemed given on the next Business Day. Notice otherwise sent as provided herein shall be deemed given on the next Business Day following timely deposit of such Notice with an overnight delivery service:

| | |
|---|---|
| If to Seller: | c/o Reed Smith LLP<br>599 Lexington Avenue, Floor 30<br>Attention: Adam Hull<br>Fax: (212) 521-5450 |
| With a copy to: | Reed Smith LLP<br>599 Lexington Avenue<br>New York, NY 10022<br>Attention: Andy Rahl<br>Fax: (212) 521-5450 |
| If to Buyer: | DBI Stores LLC<br>c/o Dunkin Brands, Inc.<br>130 Royall Street<br>Canton, MA 02021<br>Attention: Paul Carbone<br>Fax: 781-737-3184 |
| With a copy to: | Ropes & Gray LLP<br>One International Place<br>Boston, MA 02110-2624<br>Attention: Don S. DeAmicis |

Fax: (617) 235-0019

Rejection of or refusal to accept any Notice, or the inability to deliver any Notice because of changed address of which no Notice was given, shall be deemed to be receipt of the Notice as of the date of such rejection, refusal or inability to deliver.

Section 10.6    Choice of Law. This Agreement shall be construed and interpreted, and the rights of the parties shall be determined, in accordance with the substantive laws of the state of New York, without giving effect to any provision thereof that would require the application of the substantive laws of any other jurisdiction, except to the extent that such laws are superseded by the Bankruptcy Code.

Section 10.7    Entire Agreement; Amendments and Waivers. This Agreement, and all agreements entered into pursuant hereto and all certificates and instruments delivered pursuant hereto and thereto constitute the entire agreement between the parties hereto pertaining to the subject matter hereof and supersede all other prior agreements, understandings, negotiations, and discussions, whether oral or written, of the parties. This Agreement may be amended, supplemented or modified, and any of the terms, covenants, representations, warranties or conditions may be waived, only by a written instrument executed by Buyer and the Company, or in the case of a waiver, by the party waiving compliance. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), and no such waiver shall constitute a continuing waiver unless otherwise expressly provided.

Section 10.8    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Counterparts to this Agreement may be delivered via facsimile or otherwise electronically. In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom enforcement is sought.

Section 10.9    Invalidity. If any one or more of the provisions contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, the parties shall use their reasonable efforts, including the amendment of this Agreement, to ensure that this Agreement shall reflect as closely as practicable the intent of the parties hereto on the date hereof.

Section 10.10    Headings. The table of contents and the headings of the Articles and Sections herein are inserted for convenience of reference only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement.

Section 10.11    Exclusive Jurisdiction. Without limiting any party's right to appeal any order of the Bankruptcy Court, during the Case: (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide

(insofar as they relate to Seller) any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (b) any and all claims, actions, causes of action, suits and proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive Notices at such locations as indicated in Section 10.5.

Section 10.12 WAIVER OF RIGHT TO TRIAL BY JURY. SELLER AND BUYER HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

Section 10.13 Beneficiaries. Nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights or remedies of any nature under or by reason of this Agreement, except as expressly provided herein.

Section 10.14 Counting. If the due date for any action to be taken under this Agreement (including the delivery of Notices) is not a Business Day, then such action shall be considered timely taken if performed on or prior to the next Business Day following such due date.

Section 10.15 Preparation of this Agreement. Buyer and Seller hereby acknowledge that (i) Buyer and Seller jointly and equally participated in the drafting of this Agreement and all other agreements contemplated hereby, (ii) Buyer and Seller have been adequately represented and advised by legal counsel with respect to this Agreement and the transactions contemplated hereby, and (iii) no presumption shall be made that any provision of this Agreement shall be construed against either party by reason of such role in the drafting of this Agreement and any other agreement contemplated hereby.

Section 10.16 Termination of Representations, Warranties and Covenants. The representations, warranties and covenants (other than any covenant that by its express terms requires performance after the Closing) made by Seller and Buyer in this Agreement or pursuant to any other document delivered by such parties in connection herewith shall terminate on the Closing Date, provided that the representation and warranty contained in Sections 4.15 and 5.5 (Brokers and Finders) and the covenants contained Sections 3.4 (Allocation of Purchase Price), 6.5 (Access), 6.6 (Confidentiality; Privacy), 6.8 (Cure of Defaults), 6.9 (Employment Matters), 6.11 (Further Agreements), 6.11(Payment of Transfer Taxes and Tax Filings), 6.12 (Utilities), 6.13 (Proration of Taxes and Certain Charges), 6.14 (Reasonable Efforts; Notification), 6.17 (Further Assurances) and 6.20 (Post-Closing Reconciliation) shall survive indefinitely.

IN WITNESS WHEREOF, this Asset Purchase Agreement has been duly executed and delivered by the duly authorized officers of Seller and Buyer as of the date first above written.

**BUYER:**

DBL STORES LLC

By: _____

Name: Paul Cladonie

Title: VP Finance

**SELLER:**
(including affiliated debtors under the Bankruptcy Case)

KAINOS PARTNERS HOLDING COMPANY LLC

By: _____

Name:

Title:

KAINOS PARTNERS BUFFALO RE HOLDINGS LLC

By: _____

Name:

Title:

IN WITNESS WHEREOF, this Asset Purchase Agreement has been duly executed and delivered by the duly authorized officers of Seller and Buyer as of the date first above written.

**BUYER:**

By:_____
    **Name:**
    **Title:**

**SELLER:**
**(including affiliated debtors under the Bankruptcy Case)**

**KAINOS PARTNERS HOLDING COMPANY LLC**

By:_____
    Name: **Bill Teed**
    **Title:** **Executive Vice President**

**KAINOS PARTNERS BUFFALO RE HOLDINGS LLC**

By:_____
    **Name: Bill Teed**
    **Title:** **Executive Vice President**

**KAINOS PARTNERS GREENVILLE SC-RE HOLDINGS LLC**

By:_____
    Name: **Bill Teed**
    **Title:** **Executive Vice President**

**Sig - 1**

**KAINOS PARTNERS LAS VEGAS RE HOLDINGS LLC**

By: _____

Name: **Bill Teed**
Title: **Executive Vice President**

**KAINOS VINEYARD DRIVE RE LLC**

By: _____

Name: **Bill Teed**
Title: **Executive Vice President**

**KAINOS HIGHWAY 29 RE LLC**

By: _____

Name: **Bill Teed**
Title: **Executive Vice President**

**KAINOS 1996 EAST MAIN RE LLC**

By: _____

Name: **Bill Teed**
Title: **Executive Vice President**

**KAINOS WADE HAMPTON RE LLC**

By: _____

Name: **Bill Teed**
Title: **Executive Vice President**

Sig - 2

KAINOS PARTNERS LAS VEGAS LLC
OPERATING SERIES #1

By:_____

Name: **Bill Teed**
Title: **Executive Vice President**

KAINOS PARTNERS LAS VEGAS LLC
OPERATING SERIES #2

By:_____

Name: **Bill Teed**
Title: **Executive Vice President**

KAINOS PARTNERS LAS VEGAS LLC
OPERATING SERIES #3

By:_____

Name: **Bill Teed**
Title: **Executive Vice President**

KAINOS PARTNERS LAS VEGAS LLC
OPERATING SERIES #4

By:_____

Name: **Bill Teed**
Title: **Executive Vice President**

KAINOS PARTNERS LAS VEGAS LLC
OPERATING SERIES #5

By:_____

Name: **Bill Teed**
Title: **Executive Vice President**

Sig - 4

**KAINOS PARTNERS LAS VEGAS LLC**
**OPERATING SERIES #6**

By: _____

Name: **Bill Teed**
Title: **Executive Vice President**

**KAINOS PARTNERS LAS VEGAS LLC**
**OPERATING SERIES #8**

By: _____

Name: **Bill Teed**
Title: **Executive Vice President**

**KAINOS PARTNERS LAS VEGAS LLC**
**OPERATING SERIES #10**

By: _____

Name: **Bill Teed**